# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL BEREZIN, Derivatively on Behalf of Nominal Defendant DANIMER SCIENTIFIC, INC., <br><br> Plaintiff, <br><br> v. <br><br> STEPHEN E. CROSKREY, JOHN A. DOWDY, III, RICHARD HENDRIX, JOHN P. AMBOIAN, PHILIP GREGORY CALHOUN, GREGORY HUNT, ISAO NODA, STUART PRATT, CHRISTY BASCO, ANDREA K. TARBOX, TOR B. BRAHAM, JONATHAN FURER, HAROLD FORD JR., and JOHN W. SWEET, <br><br> Defendants, <br><br> and <br><br> DANIMER SCIENTIFIC, INC., <br><br> Nominal Defendant | Case No. |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Samuel Berezin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Danimer Scientific, Inc. ("Danimer" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available

1

information, including filings by Danimer with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record, and books and records produced by the Company in response to Plaintiff's demand pursuant to 8 Del. C. § 220 ("220 Demand").

## I.     NATURE AND SUMMARY OF THE ACTION

1.     Danimer is a polymer company that creates bioplastic replacements for traditional petroleum-based plastics and sells them under the brand name Nodax. It became a public entity in December 2020 via business combination with Live Oak Acquisition Corp. ("Live Oak"), a special purpose acquisition company.

2.     The Company publicly claimed that Nodax is "100% biodegradable" within "12-18 weeks after the product is discarded." It also touted its "take or pay" contracts with customers as a "huge differentiator in the polymer world" which have "fully sold out [Danimer's] current production capacity."

3.     On March 20, 2021, *The Wall Street Journal* ("WSJ") published an article entitled "Plastic Straws That Quickly Biodegrade in the Ocean? Not Quite, Scientists Say." The article reported that "many claims about Nodax are exaggerated and misleading, according to several experts on biodegradable plastics." Contrary to Danimer's claims that Nodax products can biodegrade in oceans within a few months, the WSJ article noted that "variations in temperature and microorganisms in the ocean make it very difficult to promise a bottle made from Nodax will biodegrade in 18 months."

4.     On this news, the Company's stock price fell $6.43, or 13%, to close at $43.55 per share on March 22, 2021.

5.     Though Danimer issued a response purporting to rebut these claims, Spruce Point Capital Management ("Spruce Point") published a report on April 22, 2021 noted that "Danimer's

scientific support and rebuttal to the WSJ article is based on research conducted by University of Georgia professors who have received financial backing from Danimer and have had their students hired by the Company." It pointed out that, following the WSJ article, Danimer "removed statements claiming 'derived from 100% renewable source' and 'fully degradable in 12-18 weeks after the product is discarded' from its investor presentation." The April 22 Spruce Point report also questioned Danimer's production capacity. It stated that there were "multiple inconsistent descriptions of the size of its facility, production capacity, and costs that differ from other Company statement or government documents."

6.      On this news, the Company's stock price fell $2.01, or 8%, to close at $22.99 per share on April 22, 2021.

7.      On May 4, 2021, Spruce Point published a follow-up report, citing documents from Freedom of Information Act requests." Specifically, the documents "suggest[] Danimer's production figures, its pricing, and rosy financial projections are wildly overstated." On this news, the Company's stock price fell $1.49, or 6.3%, to close at $22.14 per share on May 4, 2021.

8.      On September 15, 2021, Muddy Waters issued a report corroborating Spruce Point's findings. It further alleged that Danimer "significantly misrepresented the state of its customer relationships, demand, product development, readiness to scale, and TAM for PHAs." On this news, the Company's stock price fell $2.51, or 14.5%, to close at $14.73 per share on September 15, 2021.

9.      In December 2021, Danimer disclosed that it had received a document request from the SEC in May 2021 as part of its "non-public, fact-finding inquiry, requesting that the Company voluntarily produce certain specified information." The SEC has had additional requests for information, and the Company has responded to all such requests.

10.     These revelations precipitated the filing of a securities class action in the U.S. District Court for the Eastern District of New York against Danimer and certain of the defendants named herein, captioned *In re Danimer Scientific, Inc. Securities Litigation*, Case No. 21-cv-02708 (the "Securities Class Action").

11.     Plaintiff did not make a litigation demand prior to filing this action because such action would have been futile based upon the composition of the Board and the actions taken by the Board, as alleged herein.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in Delaware and is thus a citizen of this District.  Additionally, the Company's bylaws contain a forum selection clause requiring shareholder derivative actions like this one to be filed in this District.

## III.     PARTIES

**Plaintiff**

14.     Plaintiff purchased shares of Danimer stock in December 2020 and has continuously owned his Danimer stock since that date.  He currently owns 300 shares.

**Nominal Defendant**

15.      Nominal Defendant Danimer is a Delaware corporation with its principal executive offices located at 140 Industrial Boulevard, Bainbridge, GA 39817.  The Company's Class A common stock trades on the New York Stock Exchange ("NYSE") under the symbol "DNMR."

**Defendants**

16.      Defendant Stephen E. Croskrey ("Croskrey") has served as Danimer's Chief Executive Officer ("CEO") and a member of the Board since February 2016.

17.      Defendant John A. Dowdy, III ("Dowdy") has served as Chief Financial Officer ("CFO") of Danimer (and, prior to Business Combination, Legacy Danimer) since May 2014.

18.      Defendant Richard Hendrix ("Hendrix") has served as a director of Danimer since December 2020. Prior to that, he was CEO of Live Oak and a director of Live Oak from May 2020 to December 2020.

19.      Defendant John P. Amboian ("Amboian") has served as a director of Danimer since December 2020. Prior to that, he was chairman of Live Oak from May 2020 to December 2020.

20.      Defendant Philip Gregory Calhoun ("Calhoun") has served as a director of Danimer (and, prior to Business Combination, Legacy Danimer) since 2014.

21.      Defendant Gregory Hunt ("Hunt") has served as a director of Danimer (and, prior to Business Combination, Legacy Danimer) since June 2019.

22.      Defendant Isao Noda ("Noda") has served as a director of Danimer (and, prior to Business Combination, Legacy Danimer) since 2016.

23.      Defendant Stuart Pratt ("Pratt") has served as a director of Danimer (and, prior to Business Combination, Legacy Danimer) since May 2015.

24.      Defendant Christy Basco ("Basco") served as a director of Danimer (and, prior to Business Combination, Legacy Danimer) from July 2020 to August 2022.

25.     Defendant Andrea K. Tarbox ("Tarbox") was CFO of Live Oak and a director of Live Oak.

26.     Defendant Tor R. Braham ("Braham") was a director of Live Oak.

27.     Defendant Jonathan Furer ("Furer") was a director of Live Oak.

28.     Defendant Harold Ford Jr. ("Ford") was a director of Live Oak.

29.     Defendant John W. Sweet ("Sweet") was a director of Live Oak.

30.     Defendants Croskrey, Dowdy, Hendrix, Amboian, Calhoun, Hunt, Noda, Pratt, and Basco are sometimes referred to hereinafter as the "Danimer Individual Defendants." Defendants Amboian, Tarbox, Braham, Furer, Ford, and Sweet are sometimes referred to hereinafter as the "Live Oak Individual Defendants." The Danimer Individual Defendants and the Live Oak Individual Defendants are collectively referred to as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers, directors, and/or fiduciaries of Danimer and because of their ability to control the business and corporate affairs of Danimer, at all relevant times, the Individual Defendants owed Danimer and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Danimer in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Danimer and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Danimer and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Danimer, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Danimer, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

33.     To discharge their duties, the officers and directors of Danimer were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Danimer were required to, among other things:

> (a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

> (b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

> (c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

> (d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.      SUBSTANTIVE ALLEGATIONS

### A.      Background

34.     Meridian Holdings Group, Inc. d/b/a Danimer Scientific ("Legacy Danimer") acquired the patents underlying polyhydroxyalkanoate ("PHA") from Procter & Gamble Company in 2007 and has since sought to commercialize PHA. Legacy Danimer manufactures PHA and sells it under the brand name Nodax as a purportedly "100% biodegradable plastic feedstock alternative."

35.     In October 2020, Legacy Danimer entered an agreement to become a public entity via business combination with Live Oak Acquisition Corp. ("Live Oak"), a special purpose acquisition company formed for the purpose of effecting a merger, acquisition, reorganization, or similar business combination with one or more businesses.

**B.      The Individual Defendants Cause the Company to Issue Materially Misleading Statements**

36.     On October 5, 2020, the Individual Defendants caused Live Oak and Legacy Danimer to announce that they had entered into a definitive merger agreement, in which they claimed that Nodax is "100% biodegradable." The press release also made the following claims about Legacy Danimer's production facilities and its key partnerships:

> ***Danimer is currently producing and shipping Nodax™ at an industrial scale level from its existing facility in Winchester, Kentucky. The company has partnered with key plastics manufacturers and consumer products companies such as PepsiCo, Nestlé, Genpak, WinCup, Columbia Packaging Group and Plastic Suppliers Inc.*** as they transition a wide variety of plastic applications, including straws, food and beverage containers, flexible packaging, agricultural and medical applications, among others. Based on signed and pending contracts, ***the company is fully sold out of all production in its Kentucky facility and will use their increased capital base to significantly increase production, to meet the current and long-term demand of its customer base.***

37.     The same day, a conference call was held to discuss the Business Combination. During the call, defendant Hendrix stated that "Danimer's PHA polymer is the first commercially available PHA in the world to be certified as marine degradable, which is the highest standard of biodegradability. It means the material will fully degrade in ocean water without leaving behind harmful microplastics."  Defendant Croskrey similarly stated that "fresh water and finally marine degradable are the most difficult and highest standards to achieve because there's less and less bacteria" and "Danimer's PHA products are certified as marine degradable."

38.     During the same October 5, 2020 call, defendant Hendrix claimed that Danimer has "take-or-pay contracts that are a huge differentiator in the polymer world" and that "Danimer is

currently in receipt of contracts that have fully sold out its current production capacity, as well as the capacity that will come online with the phase two plant expansion[.]" Likewise, defendant Croskrey stated that the "100% take-or-pay contracts on [Danimer's] products . . . help us drive costs out of our business as we scale up production to meet [customers'] needs."

39.     Also on October 5, 2020, the Individual Defendants caused the Company to file an investor presentation as an attachment to a Form 8-K with the SEC. The presentation claimed that Nodax is "[f]ully degradable in 12-18 weeks after the product is discarded." It reiterated claims made during the call that Danimer had a "Rapidly Growing Blue Chip Customer Base with Take-or-Pay Contracts [that] has led to [a] Fully Sold-Out Position." To meet this customer demand, Danimer would complete its Phase 1 build-out that would enable the Company to produce approximately 20 million pounds of finished PHA product annually, and the Phase II expansion would increase production capacity by 45 million pounds.

40.     On October 21, 2020, the Individual Defendants caused Danimer to announce an agreement with Bacardi for a "100% Biodegradable Spirits Bottle." The press release claimed that the "new 100% biodegradable bottle" manufactured with Nodax "will biodegrade in a wide range of environments, including compost, soil, freshwater and sea water, and after 18 months disappear without leaving behind harmful microplastics."

41.     On November 17, 2020, the Individual Defendants caused Danimer to announce that the Company "will produce biodegradable drinking straws for the quick service restaurant (QSR) industry." The press release claimed that Danimer's PHA is a "proven biodegradable alternative to traditional petrochemical plastics" and that the "straws will degrade in environments ranging from industrial composting facilities to home compost units and oceans without leaving behind microplastics."

42.     On December 16, 2020, the Live Oak Individual Defendants caused Live Oak to issue a proxy statement/prospectus on Form 424(b)(3) soliciting stockholder approval of the Business Combination, among other things. It was signed by defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford, and Sweet. It claimed that Danimer offered "100% biodegradable polymers for use in plastic applications" and that Danimer had "strong partnerships with industry leaders, such as CPG brands including Pepsi and Nestle."

43.     On March 16, 2021, the Danimer Individual Defendants caused the Company to announce an agreement with Mars Wrigley "to develop an innovative home compostable packaging for a more sustainable planet." It stated, in relevant part:

> Danimer Scientific's signature packaging - Nodax® polyhydroxy– alkanoate (PHA) – is produced through natural fermentation processes using plant oils such as soy and canola and biodegrades in both soil and marine environments. Mars will continue to evaluate opportunities to scale this novel, innovative and sustainable packaging technology across its portfolio of brands and categories.
>
> **Danimer Scientific and Mars Wrigley plan to introduce Nodax®PHA into flexible and rigid packaging that reliably breaks down in both industrial composting facilities and backyard compost units**, offering an enhanced value proposition for environmentally conscious consumers and retailers. Sourced from the seeds of plants such as canola and soy, Nodax®PHA can serve as an alternative to traditional petrochemical plastic and **has been certified as biodegradable in soil and marine environments.** In addition to better end-of-life options, Nodax® PHA is renewably sourced, making it a truly circular material that helps eliminate waste.

44.     The above statements in ¶¶ 36-43 were materially misleading because they: (i) overstated the biodegradability of Nodax; (ii) overstated Danimer's production capacity; and (iii) misrepresented demand for Nodax, including the nature of its purported customer partnerships.

## C.     The Truth Fully Emerges

45.     On March 20, 2021, *The Wall Street Journal* ("WSJ") published an article entitled "Plastic Straws That Quickly Biodegrade in the Ocean? Not Quite, Scientists Say." The article reported that "many claims about Nodax are exaggerated and misleading, according to several

experts on biodegradable plastics." Quoting Dr. Jason Locklin, a professor at University of Georgia, the article stated that Danimer's claims are "sensationalized" and making broad claims about Nodax's biodegradability is "greenwashing." In fact, Dr. Locklin had conducted the study that Danimer describes in its marketing material as verifying Nodax as "a truly biodegradable alternative," but it had shown that "Nodax in powdered form breaks down quickly, but that the rate is much more variable when tested as a film, the form used to make bags, straws and bottles."

46.     Contrary to Danimer's claims that Nodax products can biodegrade in oceans within a few months, the WSJ article noted that "variations in temperature and microorganisms in the ocean make it very difficult to promise a bottle made from Nodax will biodegrade in 18 months." Moreover, the marine biodegradability test used to gain certification examines Nodax using seawater at a temperature of 30 degrees Celsius, but the average ocean temperature is 4 degrees Celsius, "which means items could degrade more slowly in real life," according to another professor who has researched biodegradable plastics for decades.

47.     On this news, the Company's stock price fell $6.43, or 13%, to close at $43.55 per share on March 22, 2021.

48.     On March 26, 2021, defendants Croskrey, Amboian, Basco, Calhoun, Hendrix, Hunt, Noda, and Pratt attended a Board meeting where they discussed the WSJ article and "how to respond to associated questions during the earnings call on Monday March 29, 2021."

49.     On April 8, 2021, Danimer issued a response to the WSJ article, stating that "[a]ny claims of biodegradability we make are backed by international testing standards." The Company did not dispute that "variable environmental conditions can influence the amount of time it takes for our material to biodegrade," but stated that "we are very clear about this on our website."

Danimer's statement also included a copy of Dr. Locklin's letter to the editor of the WSJ which

stated, in relevant part:

> The article includes two quotations attributed to me. While I don't question that I said the quoted words, to the best of my memory, my statements were in reaction to broad marketing claims by converters or brands selling PHA-based products without proper context that biodegradation time is variable with environmental conditions. **To the best of my knowledge, I was not made aware during the interview, and I am not otherwise aware, of any such marketing claims made by Danimer Scientific, Inc. (producer of "Nodax," a PHA copolymer) that are "sensationalized" or constitute "greenwashing" in my opinion.**

(Emphasis in original.)

50.     However, as pointed out by a report by Spruce Point Capital Management ("Spruce

Point") on April 22, 2021, Dr. Locklin and the University of Georgia "have significant financial

ties to Danimer, [which] the Company has tried to obscure by removing press releases [published

between 2012 and 2017] from its website," one of which "is the announcement of funding to

University of Georgia Labs," suggesting Dr. Locklin had a financial incentive to dispute the WSJ

article. The Spruce Point further stated  that "Danimer's scientific support and rebuttal to the WSJ

article is based on research conducted by University of Georgia professors who have received

financial backing from Danimer and have had their students hired by the Company." It also

highlighted that Pepsi had sold its equity stake in Danimer during the second quarter of 2021,

according to Pepsi's quarterly report filed in April 2021. It pointed out that, following the WSJ

article, Danimer "removed statements claiming 'derived from 100% renewable source' and 'fully

degradable in 12-18 weeks after the product is discarded' from its investor presentation."

51.     The April 22 Spruce Point report also questioned Danimer's production capacity.

It stated that there were "multiple inconsistent descriptions of the size of its facility, production

capacity, and costs that differ from other Company statement or government documents."

52.     On this news, the Company's stock price fell $2.01, or 8%, to close at $22.99 per share on April 22, 2021.

53.     On April 24, 2021, defendants Croskrey, Amboian, Basco, Calhoun, Hunt, Pratt, and Noda attended a Board meeting where they discussed that Sard Verbinnen & Co. ("SVC") had been engaged "to provide guidance to the Company on public relations and crisis management matters following several recent occurrences," including the WSJ article and the April 22 Spruce Point report. They discussed the allegation that Danimer's "PHA offerings are not sufficiently biodegradable" and concluded that it was "without merit."

54.     On May 4, 2021, Spruce Point published a follow-up report, citing documents from Freedom of Information Act requests." Specifically, the documents "suggest[] Danimer's production figures, its pricing, and rosy financial projections are wildly overstated." It stated, in relevant part:

> Monthly Kentucky PHA production figures have been restated by up to 100% after coming public. Danimer's PHA average selling price appears to be 30% - 42% below management's claims. Moreover, Danimer's recently reported production figures are so far below their actual capacity that it calls into question why Danimer is telling investors it needs hundreds of millions of dollars in capacity expansion?

55.     As to average selling price, the May 4 Spruce Point report stated:

> Danimer's October 2020 Investor Presentation implied PHA ASPs of $3.00/lb. and the CEO alluded to pricing in the $2.50-$2.70 range on the year end conference call in March 2021. However, based on Danimer's 2.5m lbs. of certified actual production, and $4.4 of reported PHA sales, we estimate PHA ASPs were closer to $1.74/lb, or 30% - 42% lower than discussed by management. Danimer's Investor Presentation said it was in a 'Fully Sold-Out' position. Even if we assume a one-month lag between production and shipment, ASP would still be $2.01/lb or 20% - 33% below management's claims.

56.     On this news, the Company's stock price fell $1.49, or 6.3%, to close at $22.14 per share on May 4, 2021.

57.     On September 15, 2021, Muddy Waters issued a report corroborating Spruce Point's findings. It further alleged that Danimer "significantly misrepresented the state of its customer relationships, demand, product development, readiness to scale, and TAM for PHAs." It stated, in relevant part:

> In our view, **DNMR has misled investors about having over $200 million of "take or pay" agreements.** We feel it has misled investors by stating that its only impediment to selling more product is lack of capacity when the products it hopes to sell do not yet exist. **It expressly claimed that it can sell everything it produces, but in actuality the demand for its products appears to be quite weak**. DNMR has announced four iterations of its capacity expansion plan in eight months, which indicates that it is likely to waste significant time and money trying to scale. Yet, DNMR's purchase of Novomer seems to be a tacit admission that its fermentation might not scale. 64 In 2015, DNMR claimed that Bainbridge had 60 million pounds per year of capacity; but, today it's supposedly just a demonstration plant. DNMR has tried to mislead investors into believing that bag developed with PepsiCo is PHA when it is really PLA based.

58.     The Muddy Waters report also alleged that demand for Danimer's products is "limited" and that Danimer has "significant (but below the radar) PHA production misses." It stated, in relevant part:

> What DNMR can produce seems to have limited demand, which is in stark contrast to CEO Stephen Croskrey's pronouncement that DNMR can sell all the PHA it produces and the company's claim that it is "fully sold-out of [2022E] Kentucky capacity from overwhelming demand". **Instead, DNMR seems unable to make PHA for the products for which there seems to be significant potential market.** DNMR has likely not produced PHA for products sold to end users, other than straws and possibly plastic shopping bags.
>
> Supporting our conclusion that demand for DNMR's existing products seems quite weak are **DNMR's apparent significant (but below the radar) PHA production misses in each of Q1 and Q2 this year.** Using company favorable assumptions, we estimate that DNMR has been operating at only 28% of capacity, rather than the expected 50%. **Less company favorable, but still reasonable, assumptions yield estimates as low as 18% capacity.** Moreover, DNMR's slow-turning inventory (~3x) consistently shows zero to de minimis amounts of work in process while having **material balances of both raw materials and finished goods**, which we think shows that there is not much demand for what DNMR is capable of producing.

59.   The Muddy Waters report also alleged that Danimer's purported partnerships were still in the developmental stages. It stated, in relevant part:

> DNMR has greatly misled investors about its partnerships. When DNMR went public, Mr. Croskrey said on CNBC that the company was "sitting on over $200 million of take or pay off agreements, and we had customers like PepsiCo, Nestle, Bacardi, you know expecting us to be able to grow our capacity, so we had to find a way to find a lot of cash fast." We believe that the products DNMR hopes to produce for these partners are in the very early stages of development, and that production capacity was not even close to being an issue for these products. These purported "take or pay" agreements reportedly have outs for the customers if DNMR has been unable to develop product that meets customer requirements. ***Moreover, we understand that the PepsiCo take or pay was for pilot plant scale, and that DNMR likely has not finalized a commercial-scale agreement with PepsiCo.*** We also understand that Mars Wrigley will likely not be using in scale a DNMR plastics wrapper before 2025 – if ever; and, ***that PepsiCo is probably many years away (if ever) from any sizable PHA compound purchases from DNMR.***

60.   On this news, the Company's stock price fell $2.51, or 14.5%, to close at $14.73 per share on September 15, 2021.

61.   On September 17, 2021, Danimer issued a response to the Muddy Waters report, making general statements and conclusions to undermine its credibility but failing to address the report's claims. For example, the response stated that "demand is evident in the numerous partnerships Danimer has established," citing companies that are "currently working with Danimer to produce biodegradable and compostable alternatives to plastic products," but did not dispute Muddy Waters' claim that these partnerships were still in its early stages. Moreover, it reported that Danimer's nameplate production capacity of PHA is half of its prior representations:

> The Company discusses production volumes in terms of finished pounds, rather than neat PHA (a.k.a. "Nodax®"), because finished product is what is sold to customers.
>
> Prior to considering the integration of Rinnovo™ in its formulations, Danimer has stated that finished capacity at its Kentucky Phase I facility is 20 million finished pounds per year, ***which means that the Kentucky Phase I facility's capacity is 10 million pounds of Nodax®.*** The Company has previously noted that, on average, Nodax® comprises approximately 50% of the formulation for finished product. Through repetition and continuous improvement, Danimer is scaling its production

capacity and will continue to manufacture as much Nodax® as possible. Because the Muddy Waters analysis conflates these figures, below are the correct figures for Danimer's Kentucky Phase I facility:

- In Q1 2021, Danimer produced approximately 1.4 million pounds of Nodax®, which equates to approximately 55% capacity utilization for the three-month period.

- In Q2 2021, during which time Danimer completed the debottlenecking of its facility, the Company produced approximately 1.2 million pounds of Nodax®, which equates to approximately 47% capacity utilization for the three-month period.

- In July 2021, Danimer produced approximately 0.6 million pounds of Nodax®, which equates to approximately 69% capacity utilization for the one-month period.

As previously detailed and prior to considering the integration of Rinnovo™ in the Company's formulations, Phase II construction in Kentucky is underway with production expected to commence in Q2 2022, adding an expected 45 million pounds of finished product (or approximately 22.5 million pounds of Nodax®) to annual nameplate PHA capacity.

62.    In December 2021, Danimer disclosed that it had received a document request from the SEC in May 2021 as part of its "non-public, fact-finding inquiry, requesting that the Company voluntarily produce certain specified information." The SEC has had additional requests for information, and the Company has responded to all such requests.

**D.    The Danimer Defendants Issued a Materially Misleading Proxy Statement**

63.    On June 30, 2022, defendants Croskrey, Hendrix, Amboian, Calhoun, Hunt, Noda, Pratt, and Basco issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held August 11, 2022. In the proxy statement, these eleven directors solicited stockholder votes in favor of four management proposals, including the election of Croskrey, Hendrix, Amboian, Calhoun, Hunt, Noda, and Pratt to new terms as directors.

64.    The proxy statement disclosed that the Board had determined that defendants Croskrey and Pratt were not independent.

16

65.     As to the Board's role in risk oversight, the proxy statement stated, in relevant part:

Management is responsible for the day-to-day management of risks the Company faces, while the Board of Directors, as a whole and through its committees, provides risk oversight. In its risk oversight role, the Board of Directors assesses whether the risk management processes designed and implemented by management are adequate and functioning as designed, including assessing major risk factors relating to the Company and its performance, and reviewing measures to address and mitigate risks. In order to efficiently discharge its duty to oversee risk management, the Board of Directors has delegated some risk oversight tasks to various committees of the Board of Directors and to members of management, each of which reports regularly to the entire Board with respect to such responsibilities. In particular, the Audit Committee plays a significant role in monitoring and assessing our financial, legal, and operational risks, and it receives regular reports from the management team regarding comprehensive organizational risk and particular areas of concern.

66.     The proxy statement further stated that the "Code of Ethics, Corporate Governance Guidelines, and the charters of our Audit, Compensation and Nominating and Corporate Governance Committees were adopted by Danimer to promote honest and ethical conduct, full, fair, accurate, timely and understandable disclosure in periodic reports required to be filed by Danimer, and compliance with all applicable rules and regulations that apply to Danimer and its officers and directors."

67.     The Code of Ethics, incorporated by reference into the proxy statement, claims to "promote the full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission (the 'SEC'), as well as *in other public communications made by or on behalf of the Company*." As to "Disclosure," the Code of Ethics states:

The Company strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate. Each person must:

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to

17

the Company's independent registered public accountants, governmental regulators, self-regulating organizations and other governmental officials, as appropriate; and

- in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

In addition to the foregoing, the Chief Executive Officer and Chief Financial Officer of the Company and each subsidiary of the Company (or persons performing similar functions), and each other person that typically is involved in the financial reporting of the Company, must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company.

Each person must promptly bring to the attention of each Chairperson of the Board (the "Chairperson") any information he or she may have concerning (a) significant deficiencies in the design or operation of internal and/or disclosure controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

68.     The proxy statement was materially misleading because it misrepresented the Board's activities with respect to accuracy of disclosures while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties. Specifically, the Board claimed to exercise risk oversight and promote accurate disclosure, yet it did not even attempt to review Danimer's April 8, 2021 response to the WSJ article. In response to Plaintiff's 220 Demand, the Company represented that there were no other Board-level documents between December 2020 and October 2021 regarding the biodegradability of Nodax, other than the minutes for the March 26, 2021 and April 24, 2021 meetings. A reasonable shareholder would have found the truth to be material when deciding to vote for or against these proposals.

69.     On August 15, 2022, Danimer filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the proxy statement. In particular, Croskrey, Hendrix, Amboian, Calhoun, Hunt, Noda, and Pratt were reelected to new terms as directors. The reelection of these seven directors based on the misleading statements contained in the proxy statement and

other public filings was a fundamental link in these directors' continued breaches of fiduciary

duties and their continued enrichment at the expense of the Company's unaffiliated stockholders.

## VI.    DAMAGES TO THE COMPANY

70.    As a direct and proximate result of the Individual Defendants' conduct, Danimer

has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)    Any funds paid to settle the Securities Class Action;

b)    Costs and expenses incurred in connection with the SEC investigation,

including but not limited to penalties;

c)    Costs incurred from compensation and benefits paid to the defendants who

have breached their duties to Danimer.

71.    In addition, Danimer's business, goodwill, and reputation with its business partners,

regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted

the nature of its false statements and the true condition of its business.  The credibility and motives

of management are now in serious doubt.

72.    The actions complained of herein have irreparably damaged Danimer's corporate

image and goodwill.  For at least the foreseeable future, Danimer will suffer from what is known

as the "liar's discount," a term applied to the stocks of companies who have been implicated in

illegal behavior and have misled the investing public, such that Danimer's ability to raise equity

capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.    Plaintiff brings this action derivatively in the right and for the benefit of Danimer

to redress injuries suffered, and to be suffered, by Danimer as a direct result of the wrongdoing

alleged herein.  Danimer is named as a nominal defendant solely in a derivative capacity.  This is

not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

74.     Plaintiff will adequately and fairly represent the interests of Danimer in enforcing and prosecuting its rights.

75.     Plaintiff has continuously been a shareholder of Danimer at times relevant to the wrongdoing complained of and is a current Danimer shareholder.

76.     When this action was filed, Danimer's Board of Directors consisted of defendants Croskrey, Amboian, Calhoun, Hendrix, Hunt, Noda, Pratt, and non-party directors Cynthia Cohen and Allison Leopold Tilley. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

77.     Hunt and Amboian served as members of the Audit Committee at relevant times. As such they are responsible for the integrity of Danimer's financial statements and the accuracy of its public statements. In their capacities as Audit Committee members, Hunt and Amboian reviewed and approved the materially misleading statements and allowed them to be disseminated in Danimer's SEC filings and other disclosures. Thus, Hunt and Amboian breached their fiduciary duties  and are not disinterested, and demand is excused as to them.

78.     Croskrey is the Company's CEO and therefore is not independent under NYSE listing rules. As an employee, Croskrey derives substantially all of his income from his employment with Danimer, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis. As a result, demand is futile as to him.

79.     Amboian also lacks independence because he selected Danimer to merge with Live Oak, a special purpose acquisition company led by him.

80.     Pratt lacks independence because he receives fees pursuant to a consulting agreement with the Company. For fiscal 2021, he received $106,400 in stock and cash compensation related to such consulting agreement.

81.     Croskrey, Amboian, Calhoun, Hendrix, Hunt, Noda, Pratt could not disinterestedly consider a demand because they issued the proxy statement misrepresenting the Board's duties with respect to risk oversight. As a result of the misleading proxy statement, these seven directors were reelected to new terms.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Danimer's business and affairs, particularly with respect to issues as fundamental as public disclosures.

84.     The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Danimer.

85.     In breach of their fiduciary duties owed to Danimer, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

86.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report Company's overall prospects.

87.     As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, Danimer has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

**(Against the Danimer Defendants For Violations of Sections 14(a) of the Exchange Act)**

88.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on June 30, 2022 violated §14(a) and Rule 14a-9 because solicited stockholder approval for the election of directors while failing to disclose material facts about Danimer's business.

90.     In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

91.     The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The Proxy Statement solicited shareholder votes for: (i) director nominees; (ii) executive compensation; (iii) frequency of votes on executive compensation; and (ii) ratification of independent accounting firm.  The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

92. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Danimer, demands judgment as follows:

A.   Declaring that plaintiff may maintain this action on behalf of Danimer and that plaintiff is an adequate representative of the Company;

B.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.   Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Danimer;

D.   Directing Danimer to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Danimer and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.   a proposal to strengthen the Company's controls over financial reporting;

2.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.   a proposal to strengthen Danimer's oversight of its disclosure procedures;

4.   a provision to control insider transactions; and

5.      a provision to permit the stockholders of Danimer to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Danimer has an effective remedy;

F.      Awarding to Danimer restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: February 9, 2023     **BIELLI & KLAUDER, LLC**

          */s/ Ryan M. Ernst*
          Ryan M. Ernst (No. 4788)
          1204 North King Street
          Wilmington, DE 19801
          Tel: 302-321-5411
          Facsimile: 302-397-2557
          rernst@bk-legal.com

          **GLANCY PRONGAY & MURRAY LLP**
          Benjamin I. Sachs-Michaels
          745 Fifth Avenue
          New York, New York 10151
          Telephone: (212) 935-7400
          E-mail: bsachsmichaels@glancylaw.com

             -and-

          Robert V. Prongay
          Pavithra Rajesh
          1925 Century Park East, Suite 2100
          Los Angeles, California 90067
          Telephone: (310) 201-9150
          E-mail: rprongay@glancylaw.com
             prajesh@glancylaw.com

          *Counsel for Plaintiff Samuel Berezin*